# Illinois Official Reports

## Appellate Court

*People v. Bogan*, 2017 IL App (3d) 150156

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO M. BOGAN, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-15-0156 |
| Filed<br>Rehearing denied | April 3, 2017<br>May 2, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 13-CF-1631; the Hon. David M. Carlson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Antonio M. Bogan, of Menard, appellant *pro se*.<br><br>James W. Glasgow, State's Attorney, of Joliet (Richard T. Leonard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.<br>Justices Wright and O'Brien concurred in the judgment and opinion. |

**OPINION**

¶ 1    The defendant, Antonio M. Bogan, appeals from his conviction for being an armed habitual criminal. He argues that the State failed to present evidence sufficient to prove that he possessed a firearm.

¶ 2                                                    FACTS

¶ 3    The State charged the defendant by indictment with being an armed habitual criminal (720 ILCS 5/24-1.7(a)(1) (West 2012)) and defacing the identification marks of a firearm (720 ILCS 5/24-5(b) (West 2012)). The armed habitual criminal count alleged that the "defendant possessed a firearm, to wit: a High Point firearm, after having been convicted two or more times of the offense[ ] of Armed Robbery." The latter count alleged that the defendant possessed "a High Point handgun, upon which the manufacturer's serial number was obliterated."

¶ 4    At the defendant's bench trial, Officer John Byrne of the Joliet police department testified that on July 27, 2013, he received information to be on the lookout for the defendant, possibly driving a white Chevrolet Impala. Upon observing a white Impala, Byrne performed a traffic stop. Three individuals were in the Impala, but the defendant was not among them. However, Byrne noticed the defendant sitting on a porch in front of an apartment building "right next to where the traffic stop was initiated." Byrne also observed a green Oldsmobile Cutlass in the parking lot of the apartment complex. After learning that the defendant was the registered owner of the green Cutlass, Byrne maintained visual contact with that vehicle until a search warrant could be obtained.

¶ 5    Officer Chris Delaney, an evidence technician for the Joliet police department, testified that he was directed to search the green Cutlass parked at 1911 Moore Street. Delaney performed the search alongside Detective Jeffrey German. Delaney testified that he discovered the following items in the backseat of the Cutlass: a .22-caliber Ruger handgun; "a black .40 caliber semi-automatic handgun Hi-Point"; an "AR-15 style rifle"; and a black canvas bag containing five 30-round magazines for the rifle, a box of .32-caliber ammunition, and a box of .223-caliber ammunition for the rifle. Delaney explained that the rifle was in its own bag, while the two handguns were wrapped in a sweatshirt. Delaney found latent fingerprints on the box of rifle ammunition and submitted those for analysis.

¶ 6    Detective German testified that he was dispatched to 1911 Moore Street on the afternoon of July 27, 2013. When he arrived at the scene, the defendant was handcuffed in the back of a squad car, holding an iPhone. German collected the iPhone for evidence and obtained the defendant's consent to search his apartment. The State submitted into evidence the form signed by the defendant authorizing the search. That form listed the defendant's address as 1911 Moore Street, apartment No. 103. The State also submitted into evidence the vehicle registration for the green Cutlass. That vehicle was registered to defendant with an address of 1911 Moore Street, apartment No. 103.

¶ 7    German testified that he participated in the search of the defendant's apartment. During that search, German found a handmade cardboard target. German testified that he observed five holes in the target, and surmised that those holes had been made by arrows.

¶ 8        German also participated in the search of the green Cutlass. He described in detail the nature of the location of the items found during that search. Across the backseat of the vehicle was a black garment bag. Inside that garment bag was a rifle case, and inside the case was the rifle. A pile of items were found on the rear driver's side floorboard. At the top of that pile was a red plastic bag, which contained, among other items, a health insurance card bearing the defendant's name. Immediately beneath the red bag, wrapped in a black sweatshirt, were two handguns: a .40-caliber semiautomatic handgun and a .22-caliber Ruger revolver. German testified that the serial number on the .40-caliber semiautomatic handgun had been defaced. Beneath those handguns was a zipped bag, containing five empty rifle magazines and two boxes of ammunition.

¶ 9        German also found a number of papers in the front passenger seat of the green Cutlass. These papers included a towing receipt for the Cutlass, dated March 3, 2013, and signed by the defendant. They also included a receipt from Walmart dated March 18, 2013, bearing the defendant's name and address. In the trunk of the green Cutlass, German found a crossbow with arrows.

¶ 10        German testified that he entered the defendant's apartment using keys that the defendant provided. That keychain did not include a key for the green Cutlass. German testified that a slim jim was used to open that vehicle. He testified that the keys to the green Cutlass were never found.

¶ 11        Michael Murphy was qualified as an expert in the field of fingerprint examination. He testified that two of seven latent prints submitted by Delaney were suitable for comparison. He testified that a print found on the box of rifle ammunition matched the defendant. Murphy gave no testimony regarding the second fingerprint.

¶ 12        Officer Chris Botzum of the Joliet police department testified that he performed an extraction on the defendant's phone. The extraction produced four photographs, each of which was submitted into evidence by the State. Two of the pictures were of the rifle found in the backseat of the green Cutlass. Botzum testified that each of those pictures was dated July 15, 2013. The other two pictures were of the defendant himself, one dated March 31, 2013, and the other dated June 22, 2013.

¶ 13        Following Botzum's testimony, the State entered into evidence two certified convictions, showing that the defendant had previously been convicted twice of armed robbery. The State rested.

¶ 14        The defendant testified in his own defense. He testified that the green Cutlass belonged to Anton Spencer. The defendant and Spencer had been close friends for approximately 25 years. Using Spencer's money, the defendant had purchased the vehicle for Spencer and Spencer's girlfriend, Micah Smith, in the defendant's name in March 2013. The defendant did this because both Spencer's and Smith's driver's licenses were suspended.

¶ 15        The defendant testified that his vehicle was the white Impala stopped by Byrne on the date in question. The defendant explained that his mechanic, Timothy Potter, was driving the vehicle to a garage to have the brakes replaced. Potter's girlfriend and Spencer were also in the vehicle. According to the defendant, Spencer had driven the green Cutlass to the defendant's apartment, parked in the parking lot, then left in the white Impala with Potter and his girlfriend.

¶ 16        The defendant further testified that he had not been in the green Cutlass since March 2013. He hypothesized that his papers, such as his expired medical insurance card, had gotten into the

vehicle through Spencer, who also had access to the defendant's apartment. Once, when the vehicle had been towed, the defendant retrieved it from the impound lot for Spencer because the vehicle was registered in the defendant's name. Spencer had also once driven the defendant to Walmart in the vehicle.

¶ 17 The defendant testified that at some point Spencer had purchased an AR-15 rifle and sent the defendant a picture of it. Spencer also brought the weapon to show to the defendant. The defendant admitted that he had touched a box of ammunition. He denied ever putting any weapons into the green Cutlass.

¶ 18 On cross-examination, the defendant denied that he originally told German he had purchased the green Cutlass from a Michael Smith. He explained that he had actually said "Micah Smith," the name of Spencer's girlfriend.[1]

¶ 19 The State called German in rebuttal. He testified that upon arriving at the scene, he asked the defendant if he had ever been in the green Cutlass before. The defendant told German that he had not. In fact, the defendant told German that he had never seen the vehicle before. When confronted with the registration in his name, the defendant told German that he did own the vehicle, but that he had sold it two weeks earlier to a Mike Smith. The defendant did not have any contact information for Mike Smith. German was certain that the defendant had used the name Mike Smith. German testified that the defendant used the pronoun "he" when referencing Mike Smith.

¶ 20 The circuit court found the defendant guilty of both charged offenses. The court sentenced the defendant to a term of 30 years' imprisonment for being an armed habitual criminal and 5 years' imprisonment for defacing the identification marks of a firearm, to be served concurrently.

¶ 21 ANALYSIS

¶ 22 On appeal, the defendant contends that the State failed to prove him guilty beyond a reasonable doubt of either of the charged offenses, being an armed habitual criminal or defacing the identification marks of a firearm. Specifically, the defendant maintains that the State's evidence was insufficient to prove that he possessed the .40-caliber semiautomatic handgun, a mandatory element of each offense.

¶ 23 One commits the offense of being an armed habitual criminal "if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of" certain enumerated offenses. 720 ILCS 5/24-1.7(a) (West 2012). One commits the offense of defacing the identification marks of a firearm if he or she "possesses any firearm upon which any such importer's or manufacturer's serial number has been changed, altered, removed or obliterated." 720 ILCS 5/24-5(b) (West 2012). The State presented no evidence that the defendant received, sold, or transferred a firearm. Thus, for each charged offense, the State was burdened with proving beyond a reasonable doubt that the defendant possessed a firearm. *E.g.*, *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 82 ("Each essential element of the offense must be proved beyond a reasonable doubt.").

---

[1]Throughout his cross-examination, defendant referred interchangeably to a "Micah Smith" and a "Micah Schmidt."

¶ 24    At the outset, we recognize that officers in the present case actually found three firearms: an AR-15 style rifle, a .22-caliber Ruger revolver, and a .40-caliber handgun.[2] The .40-caliber handgun was the only firearm referenced in the indictment charging the defendant with being an armed habitual criminal. Moreover, it was the only firearm for which any evidence of an obliterated serial number was presented. Thus, conviction on each of the charged offenses turned on the State's ability to prove that the defendant was in possession of the .40-caliber handgun. Accordingly, the element of possession, as it relates to that particular firearm, will be the sole focus of our analysis.

¶ 25    When a challenge is made to the sufficiency of the evidence at trial, we review to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31; *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In making this determination, we review the evidence in the light most favorable to the prosecution. *Baskerville*, 2012 IL 111056, ¶ 31.

¶ 26    It is not the purpose of a reviewing court to retry a defendant. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Instead, great deference is given to the trier of fact. See, *e.g.*, *People v. Saxon*, 374 Ill. App. 3d 409, 416-17 (2007). All reasonable inferences from the record in favor of the prosecution will be allowed. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). " 'Where evidence is presented and such evidence is capable of producing conflicting inferences, it is best left to the trier of fact for proper resolution.' " *Saxon*, 374 Ill. App. 3d at 416 (quoting *People v. McDonald*, 168 Ill. 2d 420, 447 (1995)). The trier of fact is not required to accept or otherwise seek out any explanations of the evidence that are consistent with a defendant's innocence; nor is the trier of fact required to disregard any inferences that do flow from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 272 (2006); see also *Saxon*, 374 Ill. App. 3d at 416-17.

¶ 27    Where possession is an element of a charged offense, and a defendant is not found in actual possession, the State must instead prove constructive possession. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. "Constructive possession exists where there is no actual, personal, present dominion over contraband, but defendant had knowledge of the presence of the contraband, and had control over the area where the contraband was found." *People v. Hunter*, 2013 IL 114100, ¶ 19; see also *People v. Hampton*, 358 Ill. App. 3d 1029, 1031 (2005) ("As this is a constructive possession case, the State had to prove that defendant (1) had knowledge of the presence of the weapon and (2) had immediate and exclusive control over the area where the weapon was found."). Constructive possession is frequently proven through circumstantial evidence alone. *People v. Maldonado*, 2015 IL App (1st) 131874, ¶ 23.

¶ 28    In the instant case, the defendant was clearly not found in actual possession of the .40-caliber handgun. Accordingly, to prove constructive possession, the State was obligated to show that the defendant had control over the green Cutlass and that the defendant knew the .40-caliber handgun was in that vehicle. The defendant asserts that the State failed on both fronts.

¶ 29    Before proceeding, we note that the two components of knowledge and control are commonly listed in that order. However, one's knowledge of contraband may be, at least in part, inferred from one's control over the area in which the contraband is found. Control, on the

_____

[2] While the latter of these firearms was referred to throughout the trial as a .40-caliber semiautomatic handgun or a "Hi-Point," we will refer to that weapon in this analysis as the ".40-caliber handgun."

other hand, may not be inferred from knowledge. *People v. Minniweather*, 301 Ill. App. 3d 574, 578 (1998) (" '[W]here narcotics are found on premises under defendant's control, it may be inferred that the defendant had both knowledge and control of the narcotics' [citation], the inverse inference does not follow." (quoting *People v. Nettles*, 23 Ill. 2d 306, 308 (1961))). Accordingly, we will address the two components in reverse order, beginning with control.

¶ 30                                                    I. Control

¶ 31        The primary piece of evidence in support of the proposition that the defendant had immediate and exclusive control[3] over the green Cutlass is the fact that the defendant was the legal owner of that vehicle. The defendant does not dispute that he purchased the vehicle and concedes that he is the vehicle's legal owner. However, the defendant points out that "there are countless cases when owners allow other people to use their vehicle although the owner is not present." He urges that "control, rather than ownership, is the dispositive issue."

¶ 32        The defendant's argument is well-taken. It is not unreasonable to believe that some persons give up complete control of their vehicle, in some way or another, yet remain on the registration—and thus remain the technical owner. Indeed, this court has said as much in holding that "[i]t is control of a vehicle where [contraband is] found, rather than ownership, which is pertinent to proving exclusive control of the area." *People v. Robinson*, 233 Ill. App. 3d 278, 287 (1992). While we agree with the defendant that ownership is not *dispositive*, we disagree insofar as he implies that ownership is irrelevant to or not probative of the issue of control. It seems unquestionable that proof of one's ownership of a vehicle tends to make more likely the fact that that person also has control over the vehicle. While such evidence alone is surely not sufficient to demonstrate control, it is nonetheless highly probative of that element.

¶ 33        In addition to the uncontested evidence of ownership, the State produced an abundance of other evidence tying the defendant to the green Cutlass. For instance, officers found two receipts bearing the defendant's signature in the front seat of the vehicle, each from March 2013. The defendant's health insurance card was also found in the vehicle. A fingerprint on a box of ammunition found on the backseat floorboard was determined to match the defendant. The rifle found on the backseat was the same as the rifle seen in pictures found on the defendant's phone, dated just 12 days prior to the search. Finally, a crossbow with arrows was found in the trunk of the green Cutlass, while a homemade target with apparent arrow holes was found in the defendant's apartment.

¶ 34        For his part, the defendant points out supposed shortcomings in much of the State's circumstantial evidence. For example, the receipts bearing the defendant's name were dated more than four months prior to the search of the green Cutlass. The box on which the defendant's fingerprint was found contained ammunition for the rifle, as opposed to the

---

[3]Though frequently recited in illustrating the control component of constructive possession, the term "exclusive" tends to be misleading. It is well-settled that—perhaps counterintuitively—more than one person may share "exclusive" control over an object or area. *E.g.*, *People v. Scott*, 152 Ill. App. 3d 868, 871 (1987). Consequently, whether some other person in addition to defendant also had control of or access to the green Cutlass would not undermine the State's ability to prove control. Of course, such evidence might be relevant to the element of knowledge. See *infra* ¶¶ 43-48.

.40-caliber handgun that the State had to show the defendant possessed.[4] Finally, the defendant testified that Spencer sent him the pictures of the rifle, and there was no testimony that the pictures were actually taken by the defendant's phone.

¶ 35     We reject the State's repeated assertion that "the evidence was overwhelming" in this case. It was not. However, the *Collins* standard does not mandate that we determine if the evidence against a certain defendant is overwhelming. Nor does it even require a reviewing court to determine whether it would find the defendant guilty beyond a reasonable doubt. Instead, our task on appeal is to determine whether *any* rational trier of fact, when making all reasonable inferences in favor of the State, could have found the elements of the offense proven beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261.

¶ 36     In the instant case, we conclude that some rational trier of fact could conclude that the defendant had control over the green Cutlass. Though imperfect, the State presented sufficient evidence tying the defendant to the green Cutlass, including the fact the defendant was the legal owner of the vehicle. From this evidence, a rational trier of fact could infer that the defendant was a regular driver of the vehicle. Because such an inference is reasonable, it is allowed, and this court must defer to the trier of fact. See *Bush*, 214 Ill. 2d at 326; *Saxon*, 374 Ill. App. 3d at 416-17. Moreover, while the defendant's own testimony may have presented an innocent explanation of all of the State's evidence, the trier of fact was under no obligation to find the defendant's testimony credible in light of the State's impeachment evidence. More importantly, the trier of fact was not obligated to accept such an explanation in the face of an alternative, reasonable inference of control. *Sutherland*, 223 Ill. 2d at 272.

¶ 37     We write further on the component of control in order to address certain specific cases cited by the defendant in his cogent and extremely well-argued *pro se* brief. The defendant puts substantial emphasis on the fact that officers in this case never recovered a key to the green Cutlass. Citing to *People v. Scott*, 367 Ill. App. 3d 283 (2006), the defendant insists that "[p]ossession of a key necessary to access something is pertinent to proving control."

¶ 38     In *Scott*, the arresting officer observed Scott and a codefendant, Watson, remove cocaine from a mailbox. *Id.* at 284. Each time cocaine was removed from the mailbox, the removal was performed by Watson, and Watson remained in possession of the mailbox key at all times. *Id.* The appellate court reversed Scott's conviction, writing:

> "[T]he State failed to establish that defendant had the capability to maintain control and dominion over the larger bag of cocaine found in the mailbox. The evidence at trial revealed that defendant never possessed or had access to the key needed to open the mailbox where the larger bag of cocaine was later found. Each time defendant and Watson approached the mailbox, Watson opened the mailbox with the key and Watson retained possession of the key. Without the key, the mailbox containing the larger bag of cocaine was not accessible to defendant. Defendant could not control that which he could not access." *Id.* at 286.

---

[4]We disagree with the defendant regarding the relevance of his fingerprint. In making its case for constructive possession, the State merely had to prove that the defendant had control over the green Cutlass, *i.e.*, "the area where the contraband was found." *Hunter*, 2013 IL 114100, ¶ 19. Thus, the defendant's fingerprints on *any* object found within the vehicle would tend to make such control more likely.

¶ 39        To be sure, we do not disagree with the defendant that the presence of a key is relevant to the issue of control. Had the State been able to produce a key to the green Cutlass found in the defendant's possession, such evidence certainly would have bolstered its case. Moreover, the First District's decision in *Scott* is sound; where the evidence shows that one person always maintained possession of the only key to a certain area, it is nigh impossible to show that another person had exclusive control over that area.

¶ 40        However, *Scott* differs from the present case in an extremely significant way. In *Scott*, the key in question was not simply missing. It was specifically in the possession of another person, the same person who always physically possessed the cocaine. This *directly* contradicted any inference that Scott was in immediate and exclusive control of the mailbox. In the present case, no key was ever found. Presuming that a key existed, officers' failure to find the key does not foreclose the possibility that the defendant had one.[5] Insofar as the lack of a key militates against an inference of control, it certainly does not serve to fully negate the evidence presented by the State that does tend to demonstrate such control. See *Sutherland*, 223 Ill. 2d at 272 (trier of fact is not required to accept explanations of evidence that would be consistent with the defendant's innocence).

¶ 41        Next, in arguing that the State failed to sufficiently prove the component of control, the defendant also emphasizes the fact that he was at no point observed driving the green Cutlass. He also maintains that the receipts bearing his name, which ostensibly tie him to the vehicle, were so attenuated in time that they lack probative value. In support, the defendant cites *People v. Zentz*, 26 Ill. App. 3d 265 (1975), in which this court reversed a conviction in part on those grounds.

¶ 42        To be sure, the issue of control is noncontroversial in the great majority of cases where a defendant is stopped while actually driving a vehicle. While direct evidence of a defendant driving a vehicle is surely sufficient evidence of control, the defendant cites no authority in support of the proposition that it is *necessary*. Here, the State resorted to circumstantial evidence in proving that the defendant controlled the vehicle. See *supra* ¶¶ 32-33. This is sufficient. See *People v. Brooks*, 7 Ill. App. 3d 767, 777 (1972) ("The law makes no distinction between direct and circumstantial evidence which have the same legal weight and effect."). Finally, the evidentiary weight given to the months-old receipts—as related to the question of the defendant's present control of the green Cutlass—is squarely a function reserved for the trier of fact, and we will not substitute our own judgment. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999).

¶ 43                                    II. Knowledge

¶ 44        Having concluded that the State's evidence was sufficient in proving that the defendant had control over the green Cutlass, we must next consider whether the State sufficiently proved the other component of constructive possession: knowledge. That is, we ask whether the State's evidence would allow a rational trier of fact to conclude beyond a reasonable doubt that the defendant knew the .40-caliber handgun was in the green Cutlass.

---

[5]We also note that Spencer, whom the defendant claimed to be the actual possessor of the green Cutlass, was stopped in the white Impala. The fact that, despite the detention of Spencer, the key to the green Cutlass was still not found, would seem to cast doubt onto the defendant's testimony.

¶ 45    As noted earlier, knowledge may often be inferred from one's control over an area. See *supra* ¶ 30. Such an inference is certainly not always appropriate, such as where a defendant's control over an area is relatively brief. For example, in *Hampton*, 358 Ill. App. 3d at 1033, the evidence showed that Hampton was driving his brother's vehicle, and had only been driving for a few minutes before he was arrested. Though Hampton was obviously in control of the vehicle, the appellate court held that his control was not sustained enough that one would expect him to know what items were in the vehicle's glove compartment. *Id.* at 1032. While any sort of control will satisfy the first component of constructive possession, the court pointed out that only "regular, ongoing control" may give rise to an inference of knowledge. See *id.*

¶ 46    In the instant case, the nature of the State's evidence was such that an inference that the defendant had knowledge of the contents of the green Cutlass is reasonable. Because the defendant was not actually stopped or observed in the green Cutlass, proof of the fleeting type of control seen in *Hampton* was unlikely. Instead, the State necessarily had to show that the defendant had regular, ongoing control of the vehicle. By proving the defendant's ownership of the vehicle, as well as numerous connections between the defendant and the contents of the vehicle, the State carried its burden. See *supra* ¶¶ 30-42. As the State was able to show that the defendant had regular, ongoing control over the green Cutlass, a rational trier of fact could reasonably infer that the defendant would know what was in that vehicle.

¶ 47    The precise location of the evidence found in the green Cutlass gives rise to an independent inference of knowledge, further bolstering the State's case as to that component. German testified that on the rear driver's side floorboard, he found what was essentially a stack of evidence. On top was a red bag, in which the defendant's health insurance card was found. Beneath the bag was the .40-caliber handgun, wrapped in a black sweatshirt along with another handgun. On the bottom was a canvas bag of ammunition, including a box bearing the defendant's fingerprint. Thus, the item at the top and the item at the bottom of the stack could each be directly linked to the defendant. The sheer unlikelihood of the defendant lacking knowledge of items in the middle of the stack gives rise to an inference that he did, in fact, know about the .40-caliber handgun. It would similarly undermine any inference that the weapon was placed in the vehicle by another person. This inference, combined with the inference deriving from control, would allow a rational trier of fact to conclude beyond a reasonable doubt that the defendant had knowledge of the .40-caliber handgun.

¶ 48    In summary, the evidence presented by the State was sufficient to allow a rational trier of fact to conclude beyond a reasonable doubt both that the defendant was in control of the green Cutlass, and that the defendant had knowledge of the .40-caliber handgun. Thus, the State sufficiently proved that the defendant had constructive possession of that firearm.

¶ 49                                    CONCLUSION
¶ 50    The judgment of the circuit court of Will County is affirmed.

¶ 51    Affirmed.